**SO ORDERED.**
**SIGNED 22nd day of April, 2026**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**




**Randal S. Mashburn**
**Chief U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIAWATHA MANOR ASSOCIATION, INC., | Case No. 25-01916 |
| Debtor. | Hon. Randal S. Mashburn |
| HIAWATHA MANOR ASSOCIATION, INC., Plaintiff, v. CHARLES H. ABERNATHY, *et al.,* Defendants. | Adv. Pro. No. 2:25-ap-90051 |
| HIAWATHA MANOR ASSOCIATION, INC., Plaintiff, v. CAROL JO CARRARA, *et al.* Defendants. | Adv. Pro. No. 2:25-ap-90052 |

**MEMORANDUM OPINION IN SUPPORT OF ORDERS GRANTING
PLAINTIFF HIAWATHA MANOR ASSOCIATION, INC.'S
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Hiawatha Manor Association, Inc. (the "Debtor") filed a Chapter 11 bankruptcy on May 6, 2025, with the stated goal of selling two improved parcels of real property that are divided into condominium units and then fractionally owned in weekly timeshare intervals. Bankruptcy is sometimes used as a mechanism to facilitate sales of property. In fact, there are probably as many sales arising out of Chapter 11 in this district as reorganizations. In this case, the bankruptcy sales process is being used in a somewhat unconventional manner to take timeshare property interests held by several thousand owners and convert the real estate back to fee simple ownership.

The Court has at times expressed some hesitation about the Debtor's goals and has insisted on extensive transparency and maximum due process to protect the rights of the multitude of timeshare owners. After a year of effort and multiple hearings, the Debtor has satisfied the Court's concerns. The proposed sale of the whole properties benefits the bankruptcy estate as well as the defendant timeshare owners. The Debtor may proceed with selling its own and all co-owner interests in the properties pursuant to 11 U.S.C. § 363(h).

## STATEMENT OF FACTS

### *The Parties and the Properties*

The Debtor is a Tennessee non-profit corporation and the condominium owners' association for Hiawatha Manor Resort (the "East Property"), located at 8005 Cherokee Trail, Crossville, Tennessee 38572. This is the property at issue in *Hiawatha Manor Association, Inc. v. Abernathy*, Adv. Pro. No. 2:25-ap-90051. The East Property has 47 condominium units, and the Debtor owns approximately 1,764 timeshare intervals as tenant-in-common with other timeshare

owners.[1]  There are at least 1,500 other timeshare owners who are defendants in the East Property adversary proceeding.

Hiawatha Manor West (the "West Property", and together with the East Property, the "Properties"), located at 8007 Cherokee Trail, Crossville, Tennessee 38572, is the property at issue in *Hiawatha Manor Association, Inc. v. Carrara*, Adv. Pro. No. 2:25-ap-90052.  The West Property has 70 condominium units, and the Debtor owns 70 timeshare intervals as tenant-in-common with other timeshare owners.  The West Property has a separate owner's association, the Hiawatha Manor West Association, Inc. (the "West Association"), which holds and administers timeshare interests in that property.  There are approximately 2,800 timeshare intervals not owned by the Debtor, and the West Association itself also owns  a portion of the timeshare intervals.  With the exception of the West Association, the other timeshare owners are named as defendants in that adversary proceeding.

Both Properties are situated in or near the Lake Tansi Village Resort.  They were developed to be timeshare properties and were organized under Tennessee's Horizontal Property Act approximately 45 years ago.  The Properties are currently managed by HPP Property Services LLC, d/b/a Lemonjuice Solutions ("Lemonjuice").

### *Property Decline and Financial Distress*

The Debtor described years of declining ownership participation in the payment of homeowner fees, resulting in declining maintenance of the Properties.  Since 1979, thousands of timeshare intervals have been sold in Hiawatha East, but owner delinquencies have climbed to approximately 75 percent, leading to severe shortfalls in collection of dues or maintenance fees.  Many owners have abandoned their interests or transferred their interests to timeshare relief

---

[1] The exact number of units owned by the Debtor is disputed, but immaterial.

companies, which typically do not pay maintenance fees.  With the loss of funds, the Debtor has been unable to sustain normal resort operations, maintain the properties, or make capital improvements.

According to Lemonjuice, Hiawatha West has suffered similar financial losses and difficulty maintaining its property.

***Retention of Lemonjuice and Steps Taken Toward Sale***

In February 2024, the Debtor replaced its management company with Lemonjuice.  The Debtor alleges that its prior management company, which managed both the East and West Properties, contributed to the Debtor's revenue shortfalls and financial distress.  Lemonjuice was retained to both manage the East Property and identify a strategy to restore the Debtor's financial stability and address the East Property's deteriorating operations.  Strategies to be considered included reorganization, termination of the timeshare structure, or outright sale of the East Property.

In August 2024, the Board of Hiawatha West followed the Debtor's course of action and retained Lemonjuice for the same purposes of evaluating the West Property's financial viability and identifying a path to stability.

Upon its retention at each Property, Lemonjuice assumed management duties and began examining and reconciling title status, delinquency levels, owner abandonments, budget deficiencies, and unpaid maintenance accounts.

In November 2024, the Debtor and the West Association entered into a shared services agreement, pursuant to which the West Association agreed to provide spa and laundry services to the East Property for a yearly fee, while also agreeing to transfer to the Debtor 70 timeshare

intervals in the West Property (one for each of the 70 units). The transfer was accomplished through quitclaim deed soon thereafter. Thus, the Debtor became an owner in the West Property.

In February and March 2025, the Debtor solicited consent from the co-owners of the East Property to terminate the timeshare structure and sell the property. The Debtor obtained the consent of the owners of more than 700 intervals, representing approximately 99% of responding owners, but the amount was insufficient to satisfy the voting requirements in the property Declarations.[2]

Unable to obtain the required owner consent to sell outside bankruptcy, the Debtor filed for Chapter 11 bankruptcy in May 2025.

With approval from the Court, the Debtor has retained Commercial Real Estate Exchange, Inc. ("CREXI") and HREC Investment Advisors ("HREC") to market and sell the Properties. The two companies have different expertise and responsibilities in the sale process and prior experience working together. CREXI has a commercial real estate auction platform, and HREC is the largest hospitality-only commercial real estate brokerage in the country. They have already begun a broad marketing campaign.

In November 2025, the Debtor filed a motion for approval of bidding procedures, auction, and sale of the Properties (the "Sale Motion"). (Case. No. 25-01916, Doc. 110.) The Court set the Sale Motion for hearing along with pretrial conferences in these adversary proceedings on January 20, 2026. The Court approved the bid procedures and allowed the Debtor to proceed with the sale process, subject to further objection by March 9, 2026, and a determination of the § 363(h) issue

---

[2] Ms. Simmons disputes the Debtor's assertion that the Declarations made it difficult, if not impossible to obtain a quorum and the requisite votes to terminate the timeshare structure. Although the fact may be disputed, it is not material to the § 363(h) issue in this particular case. The Debtor is not required to exhaust all options outside bankruptcy before pursuing a sale in bankruptcy free and clear of co-owners' interests, although the available alternatives could be considered as a factor in certain situations.

in these proceedings.  No party filed an objection to the sale by the March 9 deadline.  The auction is scheduled to occur May 25-27, 2026, and the final sale hearing is scheduled June 9, 2026.

*Adversary Proceedings and Motions for Summary Judgment*

The Debtor commenced the two adversary proceedings contemporaneously with its Chapter 11 filing in May 2025.  While the Debtor is pursuing approval pursuant to 11 U.S.C. § 363 of most aspects of its proposed sale of the properties in the main bankruptcy case, it seeks a determination by the Court in the adversary proceedings that it may sell non-consenting co-owners' interests pursuant to § 363(h).  On January 19, 2026, the Debtor moved for summary judgment on that issue.

In support of its motions for summary judgment, the Debtor primarily relies on declarations submitted by two witnesses: Alexander Krakovsky, the CEO of Lemonjuice; and Paul Sexton, a Managing Director with the Debtor's commercial real estate broker, HREC.  Mr. Krakovsky provided the following three declarations, with substantially similar versions filed in each of the adversary proceedings: Declaration (mislabeled "Affidavit") of Alexander Krakovsky filed on January 19, 2026 ("First Krakovsky Declaration"; Adv. Pro. No. 25-90051, Doc. 42; Adv. Pro. No. 25-90052, Doc. 43); Unsworn Declaration of Alexander Krakovsky dated March 19, 2026 ("Second Krakovsky Declaration"; Adv. Pro. No. 25-90051, Doc. 50, pp. 14-15); Unsworn Declaration of Alexander Krakovsky dated April 6, 2026 ("Third Krakovsky Declaration"; Adv. Pro. No. 25-90051, Doc. 55; Adv. Pro. No. 25-90052, Doc. 51).  The Debtor also submitted an Unsworn Declaration of Paul Sexton.  ("Sexton Declaration"; Adv. Pro. No. 25-90051, Doc. 50, pp. 22-24.)

Linda Simmons, a co-owner in the East Property and a defendant in the *Abernathy* proceeding, objected to summary judgment in both proceedings and objected to most of the

Debtor's statements of material fact. However, as explained below, the Court finds that she did not create a genuine dispute as to any material fact. Therefore, the Court treats the factual statements in the Krakovsky and Sexton Declarations as undisputed.

The West Association filed a written statement in support of the sale of the West Property and Debtor's motions for summary judgment. No other party responded to the motions.

On March 31, 2026, the Court conducted a hearing and heard arguments from the Debtor's counsel and Ms. Simmons. The Court accepted supplemental record evidence after the hearing and allowed a further opportunity for any response to that supplemental proof.

## DISCUSSION

The Debtor requests a determination on summary judgment that it may sell the Properties, including co-owners' shares, free and clear of co-owners' interests pursuant to § 363(h).

### I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. A fact is "material" if "proof of that fact would establish or refute an essential element of the cause of action or defense." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (citation omitted). "Factual disputes that are irrelevant or unnecessary" to the outcome of the suit under the governing law will not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The core consideration for the Court on summary judgment is "whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a summary judgment movant has met his burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must cite to appropriate materials in the record, Fed. R. Civ. P. 56(c)(1)(A)–(B), and "specific facts showing that there is a genuine issue for trial." *Id*. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Haddad v. Gregg*, 910 F.3d 237, 249-250 (6th Cir. 2018) (internal citations omitted); *see also Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) ("The non-moving party, however, must provide more than mere allegations or denials ... without giving any significant probative evidence to support" its position.).

"When evaluating a motion for summary judgment, th[e] [c]ourt views the evidence in the light most favorable to the party opposing the motion." *Petsche v. Hruby*, No. 25-3323, ___ F. 4th ___, 2026 WL 915045, at *3 (6th Cir. Apr. 3, 2026) (citation omitted).

## II. Ms. Simmons' Objections

In a case such as this, when individual timeshare interests have little, if any, value, the Court would not expect significant involvement from the defendant co-owners. There is simply not enough at stake for any single timeshare owner to participate in a meaningful way. In fact, of the more than 4,000 defendants in the adversary proceedings, only one defendant filed an answer to either complaint for declaratory judgment on the § 363(h) issue -- Ms. Simmons.

The Court has conducted numerous pretrial and status conferences and allowed defendants to join remotely. Approximately a dozen co-owners or their family members appeared at some of these conferences to monitor the sale process and obtain information. Several expressed their support for the sale. None expressed opposition. Those that have participated have generally not been concerned about the sale but rather were most interested in being sure that they would no longer have responsibility for timeshare fees.

Since participation by the affected defendants has been so limited, the Court appreciates that one defendant has been active, as her concerns could align with some of the other co-owners who were not inclined to get involved. Ms. Simmons has been both an active and a persistent participant in the bankruptcy case and these proceedings. Because she is the only co-owner to become an active participant and has handled the matter without a lawyer, the Court has been extremely lenient in allowing her voice to be heard and taken seriously.

At times Ms. Simmons has filed "no objection" responses that she indicates are intended only to inform the Court of what she perceives to be flaws in the Debtor's filings, not to oppose the relief requested. (*See, e.g.,* Notice Regarding Scope of Issue Not Adjudicated in Connection with Debtor's [Sale Motion], Case No. 25-01916, Doc. 110.) Ms. Simmons' objections to the Debtor's motions for summary judgment are additional examples of Ms. Simmons objecting to form, but not substance.

Ms. Simmons filed objections to the motions in both proceedings, though she is only party to one. While she requests the Court deny both motions for summary judgment due to what she perceives to be deficiencies in the motions and proof, she has indicated multiple times that she does not oppose sale of the Properties. In fact, the deadline to object to the Debtor's Sale Motion

in the bankruptcy case has expired without objection by Ms. Simmons, and she expressly stated at the January 20 hearing that she did not object to the sale.

Further, at the March 31 hearing, Ms. Simmons reiterated that she does not oppose the sale of the Properties or the sale of her interest. When asked by the Court if she wanted a trial if summary judgment were denied, she stated she did not. Although she denies that her intent is to drive up the Debtor's costs or delay the sale, that would be the effect of denial of summary judgment simply to augment the record with numerous documents about facts that are not disputed.

Ms. Simmons' objections to summary judgment resulted in the Court requiring the Debtor to submit some additional evidence to support some aspects of its requests. Ms. Simmons was given an opportunity to respond to this additional proof, but she filed nothing to dispute the supplemental information, and her deadline for a response has now passed.

The Court has considered Ms. Simmons' objections and finds them to lack merit, except where they mirrored the Court's own concerns with the adequacy of the Debtor's proof on particular § 363(h) factors. This has since been remedied with the Debtor's submittal of a supplemental declaration.

### A.      Objection in *Carrara*, Adv. Pro. No. 25-90052

Ms. Simmons owns a timeshare interest in the East Property, and she is a defendant in the *Abernathy* proceeding, Adv. Pro. No. 25-90051. She claims no ownership in the West Property, and she is not a party to the *Carrara* proceeding, Adv. Pro. No. 25-90052. However, she filed a limited objection in that proceeding based on the Debtor's failure to name the West Association as a defendant.

Ms. Simmons provided no support or argument for her having standing as a non-party with no ownership interest in the West Property that would be affected in the *Carrara* proceeding, and

the Court finds no basis for standing.  Generally, bankruptcy standing requires that a person have a pecuniary interest in the outcome of the bankruptcy proceeding.  *In re Eagle-Picher Indus., Inc.*, 669 B.R. 590, 602 (Bankr. S.D. Ohio 2025) (citations omitted).  "[B]eing a party in interest for purposes of the bankruptcy case does not confer standing to appear and be heard on every contested matter or adversary proceeding arising in the base case."  *In re Cormier*, 382 B.R. 377, 409–10 (Bankr. W.D. Mich. 2008).  Furthermore, an objector is limited to asserting her own rights, not the rights of others.  *In re Dark Rhiino Sec., Inc.*, __ B.R. __, No. 24-54658, 2026 WL 1020585, at *7 (Bankr. S.D. Ohio Apr. 13, 2026).  Despite Ms. Simmons' lack of standing, the Court considered her objection about the non-joinder of the West Association and finds no merit to it.

The West Association owns timeshare interests in the West Property, so it is one of the co-owners affected by the Debtor's proposed sale.  It also has an interest in the proposed sale as the homeowners' association for the West Property.  The West Association has long supported the Debtor's efforts to sell the West Property through its bankruptcy case.  The Court takes judicial notice of the docket in the main bankruptcy case and multiple sale-related hearings, as well as the pretrial conferences in these adversary proceedings.  Counsel for the West Association entered an appearance in the bankruptcy case on September 4, 2025.  Thereafter, he appeared at multiple sale-related hearings and pretrial conferences and expressed the West Association's general support for the sale.  Furthermore, the West Association filed a written statement in support of the Debtor's motion for summary judgment and proposed sale.  (Adv. Pro. No. 25-90052, Doc. No. 48.)

While the West Association perhaps could have been named as a defendant in the *Carrara* proceeding, the Debtor obtained the West Association's consent and support for the sale free and clear of its interests.  The Debtor is effectively relying on § 363(f)(2) because it has the West Association's consent, and the Association's joinder as a party to the Carrara adversary proceeding

is not required for § 363(h) relief as to all other defendants. Even if it were required, the West Association clearly has actual notice of the proceeding and request for relief, and it has noted its support on the record.

### B. Objections in *Abernathy*, Adv. Pro. No. 25-90051

In the *Abernathy* proceeding, Ms. Simmons disputes most of the Debtor's statements of material facts. (*See* Adv. Pro. No. 25-90051, Doc. No. 49.) To contest the Debtor's facts and evidence and present a genuine dispute, Ms. Simmons must (i) cite to "particular parts of materials in the record," (ii) show that the materials cited by the Debtor "do not establish the absence … of a genuine dispute," or (iii) show that the Debtor "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

With rare exceptions addressed herein, Ms. Simmons does not cite to record materials to dispute the Debtor's facts. Instead, she either argues that the Debtor "has not produced admissible evidence" of facts, or that she has been prevented from presenting facts and evidence to dispute the Debtor's facts.

### 1. Inadequate Documentation

Ms. Simmons disputes most, if not all, statements by Mr. Krakovsky that might be based on the Debtor's books and records. In her responses to many of the Debtor's statements of material facts, she argues that the "Debtor has not produced admissible evidence supporting" the facts. She does not argue that any of the Debtor's declaration evidence is inadmissible. Instead, she appears to argue that a fact is not supported unless the Debtor includes in the record all documents that relate in any way to the factual assertion.

Ms. Simmons presents no legal authority for her argument that a statement based on personal knowledge of a company's books and records is inadequate proof in the absence of actually filing every possible document that could be relevant to the factual assertion. In fact, such

is permitted by Federal Rule of Evidence 602 (witnesses may testify about matters about which they have personal knowledge). Ms. Simmons' approach would necessitate that thousands of pages of documents be filed in the Court record to support any summary judgment effort, regardless of whether there is any real dispute about an assertion and even though a witness with sufficient knowledge has made the necessary statements under penalty of perjury. That is not what the rules require.

### 2. Facts Unavailable

Ms. Simmons also argued that she cannot present evidence to dispute the Debtor's facts because the Debtor has not produced documents. Summary judgment may be delayed when an opposing party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d). Rule 56(d) is intended to ensure that plaintiffs receive "'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (citation omitted). A party invoking Rule 56(d) must do so in good faith. *Id.* (citation omitted). Additional time is not appropriate when a party has not "diligently pursued discovery of the evidence." *Id.* at 490-91 (citations omitted).

Ms. Simmons filed an affidavit in support of her Rule 56(d) request, in which she says she needs additional time for discovery concerning the Debtor's governance authority, ownership interests in the two Properties, and vaguely, "related transactions." (Adv. Pro. No. 25-90051, Doc. No. 48-1, ¶¶ 3, 6.) She says she served requests for production of documents to the Debtor on January 30 and February 2, 2026, and the Debtor has not yet produced responsive documents.

The Court does not find Ms. Simmons' request for additional time for discovery to be justified. Since Ms. Simmons expressly does not oppose the sale of the Properties, including her

co-owner interest, delay of summary judgment to allow more time for discovery only serves to delay the sale and increase expense to the Debtor. Additionally, as discussed below, the topics on which Ms. Simmons seeks discovery (*i.e.*, governance authority and ownership) are not material to summary judgment on the § 363(h) issue.

A critical flaw in Ms. Simmons' argument about unavailability of factual information is that she declined to take advantage of the access to documents she and all other timeshare owners were given. From very early in the bankruptcy case and these proceedings, the Court has insisted on transparency and has pressed the Debtor to provide easy access to documents relevant to the sale and § 363(h) issue to all parties as soon as practicable and without requiring any formal discovery request. The Court approved the Debtor's use of a Data Room repository for the documents, with access instructions to be provided to all parties.

As of at least September 23, 2025, the Data Room was populated and accessible. (*See* Order Regarding the Status of Debtor's Disclosure of Information and Implementation of Use of Data Rooms, Case No. 25-01916, Doc. 93.). The Court did not mandate what should be included in the Data Room. However, by order entered on September 25, the Court stated it would promptly address any issues regarding sufficiency of information or accessibility upon the filing of an appropriate motion. (*Id.*) The Debtor specifically provided Ms. Simmons with instructions for accessing the Data Room by email on September 8, 2025, and told her whom to contact if she had any difficulty. (See Reply, Adv. Pro. No. 25-90051, Doc. 50, Ex. A.)

Ms. Simmons has had six months to access the Data Room, but, by her own admission at the hearing on March 31, she has not done so. She stated she does not want to sign the agreement required for accessing the Data Room, which places restrictions on use and sharing of the documents. She has never moved the Court for relief from that agreement or argued that it is any

more restrictive than authorized by the Protective Order entered on August 2025. (Case. No. 25-01916, Doc. 86.)

Apparently, Ms. Simmons seeks to circumvent the Protective Order and Data Room restrictions by serving document production requests on the Debtor without first investigating what documents have already been provided to her in the Data Room. She cannot end-run the Protective Order and Data Room by serving discovery requests, because the Protective Order expressly applies to discovery, and it states that the Debtor may produce discovery through the Data Room. (*Id.*) Ms. Simmons has not sought relief from the Protective Order.

As the party requesting additional time under Rule 56(d), Ms. Simmons has the burden of showing that specific information material to summary judgment is unavailable to her and that she has not had a reasonable opportunity to obtain it. Without having even looked to see what is available to her, she cannot say what is unavailable.[3] Ms. Simmons has not acted diligently to obtain discovery, and her request for additional time to do so is denied.

### 3. Objections Relating to the Debtor's Authority

Ms. Simmons objects that, as a threshold matter, the Debtor has not shown it had the authority to initiate the adversary proceeding and "execute the transactions on which its claims depend," which the Court takes to mean, filing the bankruptcy and moving to sell the Properties. The Debtor's petition included the normal declaration under penalty of perjury, signed by the Debtor's President, and stating that he was authorized to sign the petition on behalf of the Debtor. The Debtor points to that declaration and the written consent of the board, attached thereto, which

---

[3] The Debtor states in its Reply that documents relating to corporate governance and ownership are available to Ms. Simmons in the Data Room with reference to specific folders in the Room. The contents of the Data Room are not part of the record, nor has the Debtor submitted a sworn statement listing the contents of the Data Room. Such a list may have been helpful in refuting Ms. Simmons' Rule 52(d) request, but it is not critical to the Court's ruling, since Ms. Simmons has the burden of showing that information is unavailable to her, not the other way around.

authorizes the Debtor to file for Chapter 11 bankruptcy and gives broad authority to Lemonjuice "to take any and all actions to advance the [Debtor's] rights in connection [with the Chapter 11 case]." (Case No. 25-01916, Doc. No. 1, p. 7.) Thus, the Debtor demonstrated its authority.

In objecting to summary judgment, Ms. Simmons does not argue that the Debtor *lacked* authority or point to any record evidence that demonstrates a lack of authority. Without any contrary evidence, she has not shown a genuine dispute.

### 4. Objections Relating to the Debtor's Ownership

Ms. Simmons objects that the Debtor has not presented sufficient proof of its ownership interests in the East Property and the West Property.

With respect to the East Property, Mr. Krakovsky stated in his initial Declarations that the Debtor owned 1,764 timeshare weeks. Ms. Simmons argues generally that the Krakovsky Declaration is inadequate because it does not attach all of the underlying documentary proof of ownership. As explained earlier, the Debtor need not include in the summary judgment record all of the books and records upon which sworn statements by persons familiar with those records are based.

Ms. Simmons also argues that the 1,764 number appears to be inaccurate based on various records. The Court finds these arguments to be irrelevant. While the Debtor's ownership of *some* units in the East Property is material to § 363(h), the exact number of units owned is not. Ms. Simmons does not appear to dispute the fact that the Debtor owns a significant number of units.

To the extent the Debtor's allegedly inaccurate ownership records resulted in a co-owner not being named as a defendant or personally served, as opposed to being served through publication, any argument as to insufficiency of service or lack of notice is for the affected co-owner to raise, not Ms. Simmons. *See In re Dark Rhiino Sec., Inc.*, 2026 WL 1020585, at *7. The

Court takes judicial notice of the Debtor's service-related filings and prior representations to the Court in these proceedings and finds the Debtor to have made a concerted effort to identify and serve all co-owners with notice of its bankruptcy filing, these adversary proceedings, and its Sale Motion. Ms. Simmons has not convinced the Court that service and notice is a legitimate issue that would render summary judgment improper. To the extent the Debtor was unable to serve any individual defendant by mail, the Court already approved service by publication pursuant to Federal Rule of Bankruptcy Procedure 7004(c). If an issue ever arises over any defect in service on a particular co-owner, the Court will address it – if and when it ever comes before the Court. As for summary judgment, this objection appears to be one more pointless distraction raised by Ms. Simmons.

With respect to the West Property, Ms. Simmons argues that the Debtor has not demonstrated the legitimacy of the transfer of 70 timeshare weeks from West Association to the Debtor. First, proof of this transfer is only materially relevant to the *Carrara* adversary proceeding to which Ms. Simmons is not a party. Second, the Debtor presented adequate proof of ownership, and Ms. Simmons has not demonstrated a genuine dispute. Mr. Krakovsky stated in his initial declarations that the Debtor "holds" the 70 units. (Adv. Pro. No. 25-90051, Doc. No. 42, ¶ 5; Adv. Pro. No. 25-90052, Doc. No.43, ¶ 5.) Ms. Simmons herself filed a copy of a Quitclaim Deed evidencing the transfer of the 70 units from the West Association to the Debtor. (Simmons Obj., Ex. 2.) Yet she complains of a lack of further background evidence such as proof that the person signing the Deed on behalf of West Association had authority to do so, and that the Debtor had authority to acquire the units. If she believes there is a lack of authority, it is her burden to produce evidence of it. Instead, the Quitclaim Deed bolsters the Debtor's statement of ownership, instead of disputing it. The only flaws she points out appear to be typographical or clerical errors in the

Deed (e.g., identifying a signature date as January 8, 2024, instead of January 8, 2025), and her own misunderstanding about a provision in the Deed.[4]

Ms. Simmons has clearly dug deep to find something to challenge about a sale that she does not oppose. Her overall efforts in these proceedings have resulted in more openness and clarity about the Debtor's actions, but her objections to summary judgment on this point lack merit or support, and the Court finds it to be without genuine dispute that the Debtor owns 70 units in the West Property.

### 5. Objections Relating to § 363(h) Factors

In addition to her general evidentiary objections, Ms. Simmons also argued that conclusory statements in the Debtor's declarations are insufficient to satisfy factors (2) and (3) of § 363(h). The Court expressed its own concerns at the March 31 hearing about whether the Debtor had submitted sufficient evidence to support these factors. After hearing argument from both parties, the Court allowed the Debtor time to supplement the record and Ms. Simmons additional time to respond to any supplemental material. *See* Fed. R. Civ. P. 56(e)(1) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact[.]").

On April 6, 2026, the Debtor filed a third Declaration of Alexander Krakovsky in each of the proceedings. Ms. Simmons did not file a response indicating any further dispute. With the addition of this Declaration, the Court finds that the Debtor has satisfied its burden on summary judgment.

---

[4] Ms. Simmons also misunderstands the effect of the power of attorney clause in the Deed, believing it to provide that the Debtor as Grantee should sign the Deed, not the Grantor. She is simply wrong. The Grantor correctly signed the Deed and gave the Grantee authority to perform clerical corrections after the fact, as needed, through the power of attorney clause.

### III. Sale of Co-Owners' Interests Pursuant to 11 U.S.C. § 363(h)

While the Court has concluded that there are no genuine issues as to any material fact, it must still determine that the Debtor is entitled to the relief sought as a matter of law based on those undisputed facts. The Bankruptcy Code allows a debtor-in-possession to sell both the estate's interest in property as well as any co-owners' interest in that property when the debtor has an undivided interest as tenant in common, joint tenant, or tenant by the entirety, if certain conditions are satisfied. 11 U.S.C. § 363(h). Those conditions are that:

> (1) partition in kind of such property among the estate and such co-owners is impracticable;
>
> (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
>
> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>
> (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

*Id.*

The fourth condition is clearly satisfied in this case, as the Properties are used as vacation timeshare condominiums. The Court will discuss the other three conditions in order.

#### A. Partition in Kind is Impracticable

"Partition in kind means to split or physically divide real property among two or more co-owners who each receive a proportionate share of the real property." *Weinman v. Feshaye* (*In re Sbahtu*, No. 22-14103 TBM, 2024 WL 206342, at *17 (Bankr. D. Colo. Jan. 18, 2024); *see also* 59A Am. Jur. 2d Partition § 3 (Feb. 2026) ("In a partition in kind, the property is physically divided, and the individual interests of each joint owner are severed so that, after partition, each has the right to enjoy an estate, or dispose of the estate, without hindrance from the other."). The

alternative is "partition by sale," when real property is sold and the proceeds are divided among the joint tenants. *In re Sbahtu*, 2024 WL 206342, at *17; 59A Am. Jur. 2d Partition § 3.

There are 47 condominium units for the East Property and 70 units for the West Property. Ownership of those units is divided into weekly timeshare interests, with more than a thousand co-owners per Property. It is fairly obvious that there is no further physical partition of these Properties among the thousands of co-owners that would be practicable.[5] Incidentally, none of the co-owners has shown any desire for partition in kind.

### B. Comparative Sale Values

Section 363(h) requires the Court to consider whether the "sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners." 11 U.S.C. § 363(h)(2). According to the Debtor, its timeshare intervals have no market value. Conversely, each Property could sell as a whole for several million dollars, which would generate enough for the estate to pay all creditors in full.

The Debtor's evidence regarding the comparative values comes from its commercial real estate broker and Mr. Krakovsky. Mr. Krakovsky has 11 years of experience in the timeshare industry, including service on resort boards of directors and direct involvement in the evaluation, repositioning, and sale of timeshare properties. He has overseen the sale of numerous whole-property timeshare resorts, both in and outside bankruptcy proceedings. He is familiar with the challenges of marketing timeshare properties as individual intervals and as whole properties, and he is aware of the market conditions for the proposed sale in this case.

---

[5] Ms. Simmons complains of insufficient proof that partition in kind cannot be accomplished. Notably, this is another instance of Ms. Simmons insisting on substantial unspecified documentary proof in the record when she neither desires partition in kind nor opposes partition by sale. As to the merits of her objection, the Court considers the undisputed facts of the number of owners per property to be sufficient to draw its legal conclusion.

The Debtor's real estate broker, HREC, estimates the combined sale value for the Properties to be $5,000,000, with $2,000,000 attributable to the East Property and $3,000,000 allocated to the West Property.  Of these amounts, Mr. Krakovsky estimates that the Debtor will receive approximately $1,000,000 from the sale proceeds for its ownership interests.

In contrast, the condition of the Properties and the declining interest in timeshare ownership are such that Mr. Krakovsky believes the Debtor's timeshare intervals to have negative value.  His opinion is supported by numerous facts, as well as photos of the Properties showing disrepair.

In Mr. Krakovsky's experience, the timeshare industry as a whole has been trending down, with little to no market for the purchase and sale of timeshare interests.  The downward trend is exhibited with the Properties at issue here.

Recently, the developer (a professional timeshare sales organization) gave the Debtor 2,005 timeshare intervals in the East Property that it had been unable to sell for years.  Similarly, the developer gave the Hiawatha West Association all of its intervals in the West Property.  The developer handed the shares over to the Debtor for no cost, after several years of not paying its share of the maintenance fees.

Many owners have also deeded back their intervals to the Debtor and the West Association – 316 for East and 700 for West.  Others have sold their intervals to timeshare relief companies. Both of these options for divesting themselves of their timeshare intervals would have cost the owners hundreds of dollars, and in some instances, thousands.

The Properties are in poor condition, which would make them unattractive to individual buyers.  Nine of the units in the East Property are shuttered due to structural damage.  And more than half of the units in the West Property are closed due to life safety or structural issues.

The Debtor has provided ample proof that sale of the whole Properties will realize significantly more for the estate than the unsaleable timeshare interests.

### C. Benefit to Estate vs. Detriment to Co-Owners

The Debtor has also shown that "the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners." § 363(h)(3). The sale is estimated to provide the estate $1,000,000, which is substantially more than necessary to satisfy the estate's obligations of approximately $240,000.

After payment of creditors, with there being no equity holders, excess proceeds from the Debtor's share will be added to the distributions to be paid to co-owners for their ownership interests. The Debtor estimates that owners in the East Property may be entitled to receive approximately $622 per timeshare interval, and owners in the West Property could receive approximately $1,868 per timeshare interval. Therefore, individual co-owners should directly benefit financially from the sale of the Properties.[6] The Debtor has stated repeatedly, and most recently in the Third Krakovsky Declaration, that the Debtor will not pursue timeshare owners for collection of delinquent maintenance fees upon consummation of a sale.

On the other hand, continued ownership by the existing owners would likely be detrimental. The physical condition of the Properties is declining to the extent of units becoming uninhabitable. With no prospect for increased ownership and maintenance fee payments, there is no likelihood of the Debtor or the West Association improving the condition of the Properties and

---

[6] It is important to note that the ruling on summary judgment is limited in scope – merely allowing the Debtor to proceed with its sale efforts by including the co-owners' interests in the property to be sold. A separate sales process is underway that will determine any other issues that affect the ultimate sale of the Properties. Further, even with the approval of the sale of co-owners' interests and assuming a specific sale is approved, there will be further proceedings to determine how proceeds will be distributed. Other than some necessary sale-related disbursements at closing, all funds will be held until some later determination about distribution, either through a motion process or pursuant to a Chapter 11 plan. Any issues that could arise about specific distributions to co-owners are beyond the scope of the summary judgment motions.

maintaining them into the future. Continued ownership would cost the individual owners approximately $1,113 in maintenance fees annually for the East Property and $2,287 for the West Property. Therefore, continued ownership is costly. Simply put, outside of the proposed sale of the whole Properties, it appears that the co-owners cannot unload their intervals without expending substantial sums, while a sale should result in some modest return and avoidance of liability for any delinquent maintenance fees.

Both the estate and the individual co-owners should benefit from the proposed sale.

## V.  CONCLUSION

Based on the undisputed material facts, the Court concludes that the Debtor's proposed sale of the East Property and the West Property as whole properties, including co-owner interests, benefits both the estate and the co-owners and satisfies all conditions of § 363(h). The Debtor may sell the whole Properties, including co-owner interests, subject to other necessary approvals connected to the sale process in the main bankruptcy case.

*###*